The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Catherine E. Zinoff presiding. Thank you. Good afternoon, Council. This is People of the State of Illinois v. Oakhill Keys 4-210630 and 4-220017 and 4-220018. Are Council ready to proceed? Yes, Your Honor. All right. Would Council for the Appellant please identify herself? I am Caroline Borland with the Office of the State Appellate Defender. Thank you. And would Council for the Appellee identify himself, please? I'm Eric Levin with the Illinois Attorney General's Office on behalf of the People. Thank you very much. Ms. Borland, you may begin your argument now. Thank you, Your Honors, and good afternoon. As this Court is aware, we have raised multiple issues in the brief in the interest of time. Today, I plan on focusing on portions of our second argument regarding ineffective assistance of counsel at trial and to touch briefly at least on our third and fourth issues regarding the charges and convictions in this case. On the ineffective assistance issue, after trial, Council explained that she had a theory of complete innocence in this case, specifically that the theory had been Keys did not do this. In that regard, the only admissible direct evidence to prove that Keys killed Barbara Rose was a statement from Carol Hamilton, who said that Keys had confessed to him, where Hamilton was a long-term felon who got deals in exchange for his testimony and knew shockingly little about the actual murder in this case, mostly only about things police already knew. Indeed, in closing argument, the State even said twice, if Hamilton was all we got, he wouldn't be enough to convict you, something to that effect. In that context, Council allowed a mountain of inadmissible evidence to come in on the issue of identity through the interrogation video statements made by the officers therein, specifically references to a supposed statement that Keys had made to his cousin, Nick Patton, and through statements from the officers that their investigation had shown to them that Keys killed Rose and that they suspected he likely did so intentionally. Council had multiple different ways to exclude this evidence at trial, and her failure to do so was ineffective. First, Council failed to move to suppress a large portion of the interrogation video in its entirety after police continued to question Keys when he said, do what you got to do, ain't nothing further for us to talk about. There is no dispute that if this statement was an invocation, the police did not of the right to silence, the police did not scrupulously honor that right. The only dispute is whether Keys sufficiently did enough through that statement to invoke his right to silence. Council, with regard to that, certainly this defendant was familiar with Miranda, and he had previously indicated that he knew how to, or he had been in the situation before, and so he knew how to invoke his Miranda rights if he wanted to, isn't that correct? Yes, your honor. He had agreed then to speak with the investigators, with the detectives. Yes, yes. All right, and then in the second interview, the investigators ended up confronting him with many details of the crime, did they not? Yes, your honor. And so, wasn't the defendant really, in this instance, resisting answering questions about these particular details rather than invoking his right to silence? My answer would be no, your honor. I think one of the most telling things is that, unlike many of the cases where this comes up, the officers have given a specific chance, knowing your rights, do you want to talk to us? Or knowing this, do you want to talk? Keys did not make this invocation in any sort of context like that. He had to affirmatively state in the middle of this interrogation that he was done talking to the officers. So in that context where he's saying, if you have nothing further, or if that's your belief, if you think that I did this, we have nothing further to discuss. To me, that's just his, it's almost a transition, a rhetorical statement. Okay, you've made that conclusion, I have nothing further to talk about with you. And I think any doubt about that is also confirmed by the minutes that followed, where the police sort of pressed him and said, you know, this is your chance, this is your time to say something. If there's something you want to tell us, I'm willing to listen right now. Taking away from the evidence, but saying again, this is your chance to talk to us. And Keys persisted and said, I have nothing to say. There's nothing, there's nothing, he says. And then they say, again, this is your time to tell your story. He says, fair enough. Right. But again, he didn't specifically say, I don't want to talk to you any further. I mean, this was all in the context of their confronting him with all of the details of the crime. And I think it's in no, not, I can't think of any case that we've cited the defendant has specifically said, I don't want to talk to you Yeah, the officer specifically said your co-defendant has made a statement about you. Do you want to talk about that? And he said, no, not really. Yes, but he did that immediately. I think the only reason that mattered to the court was because the state's questioning or the officer's questioning had, I'm sorry, the state argued that he was only saying he didn't want to talk about the co-defendant statement. And the court, the court reviewing that said, we're going to construe that broader because it there's plenty of other cases. Ward, which is one of the cases that came out after we filed the opening brief that cited in the reply brief, the defendant had been talking for an hour and 20 minutes. And his statement there was, I'm going to pull that up. I ain't got, I ain't got nothing else to say, which is very similar to, we ain't got nothing further to talk about here. And in fact, the state and Ward even said nothing else to say is not, I don't want to talk with the further to talk about, are you sure this is your chance? We're willing to listen to you. And it's, he's repeatedly says no. So does that answer your honor? Yes. We're talking here about the context of this interrogation. And in your brief, you rely on the third district case people versus Hardiman for your position and your contention that the admissibility of the questions and the answers during an interrogation depends on whether they are necessary to show this context. That was the case that you relied on. Isn't that correct? Yes. For, for the police officers opinions. Yes. Right. But there is a fourth district case that actually disagrees with the necessary standard and talks about a standard of being helpful. So why should we not follow our fourth district case people versus Whitfield where we held the correct standard is whether such statements and questions are helpful. I have two responses to that. First would be Whitfield made that statement in regard to saying statements need only be helpful to be relevant. It did not say to be admissible. So even if it's relevant to be excluded, if they have an undue pro prejudicial value, they unduly. And I would say that that happened here. I would also say that the facts of this case are much different from Whitfield and Whitfield, the conference, if that was a child abuse case and the statements from the officers or questions, I think the defendant said they showed him some photos and he said, if you look at that, that looks like makeup. And the office said, no, that's not makeup. Or there will be something else where they, I have another example here. The photo shows the childhood bled. And then the defendant made a number of admissions in a car accident. He admitted that he hit his children with a belt and that the injuries in the photo were likely caused by him. He admitted he went too far. He said he needed counseling and the injuries look like abuse. This was very relevant in addition to the fact that the police never said, we believe you did this. Their less prejudicial statements led him to make these confessions, which was in contrast to his evidence at trial that he did not abuse the children and they were likely caused by a car accident. Here, the statements from the officers were much more for one thing. I mean, I won't get into the hearsay right now, but they were, they were, our investigation proves that you killed Rose. It's beginning to look like this. And they did not leave keys to change his answer in that regard. He continued to maintain that he did not kill Rose. He did not make relevant admissions. So while I would agree with this court, that statements need only be necessary to be relevant here. You can be perfectly consistent with Whitfield and said the undue prejudice here was simply so much more prejudicial that it canceled out the relevance, especially because with respect, the state argues that both the prejudicial statements made by the officers and their reference to this supposing confession that keys had made to his cousin, Nick Patton were relevant because it's a private, all of these opportunities were a chance for keys to say that he had killed Rose accidentally. And he never admitted to that. That was the very theory of relevance for all of this. And actually that was the same theory at trial. The predominant theory for four days at trial was as counsel said, post trial, he did not do this. There was a brief reference in closing where counsel said, even if you take the state's best witness, Carol Hamilton, he doesn't even show first degree murder because he said keys killed Rose while they were joking around. So if you're looking at this theory of relevance in this case, it only even went toward an extremely minor point at trial, which was not the basis. And then also during the interrogation, there's at least five instances, I won't put all of them, but I would like to put one where they gave keys a direct opportunity to say, was this accidental? At the two hour and 44 minute mark, the officer said, I'm giving you an opportunity to save that face to say, man, this was an accident. I didn't mean for it to happen. I feel bad. I freaked out. I fucked up. I got in the situation and I didn't know what to do. I'm not a guy that calls the police. I understand that. I feel you. Okay. There's a lot of people in that situation and they don't call the police. Like I said, there were at least four other times where the officers need these direct questions to keys without having to reference what Nick had supposedly told the police without referencing their own opinions, where they even gave keys a chance to say why he had not said previously that he did this and it was an accident that was directly relevant to prove to disprove that any accident had occurred. So when you're taking this balancey test of relevance versus undue prejudice, all of these additional statements are even less necessary because here's these five direct opportunities to do so. And also when you're looking at prejudice, I'm sorry. Well, I guess I was going to ask about prejudice. So if we were to put aside the first prong of Strickland, that the attorney's performance fell below the appropriate standard and looked at the second prong. I mean, even without this video recorded interview, the outcome of the trial would not have been any different, would it? I mean, we have in this case, a lot of other, albeit perhaps circumstantial evidence, but we've got Veach's testimony with respect to her date that was set and that Rose never appeared. We have Harrier's testimony regarding the strange statement when she was picking up the baby in the middle of the night. The defendant did not participate in the search. There are the videos at Walmart, at the gas station. The fact that he spent the following week with his girlfriend, Crippen, and asked for a lighter, even though he didn't smoke. I mean, there's a lot of other circumstantial evidence that this jury could have used to convict him, is there not? All of that evidence tends to show that we can see that the state's evidence was sufficient to prove that he took all of these actions to cover up Rose's death. And however, on the other hand, there's not very much evidence at all to prove that he killed Rose direct evidence only comes from Carroll Hamilton in that regard, whose testimony was, again, not only did he receive all of these deals, but it's actually a little bit alarming when you look at his testimony because he says that Keyes gives him this confession when he's crying in his, or he's crying out in his nightmares and he wants to make a confession. And then he's not, Hamilton is not able to describe much about what happened, but then he's providing details like, Keyes went to three gas stations, he even provided the name of the street. And he says, Keyes had so-and-so go into him Walmart to pick up some of these things. These are details all that the police already knew. And so the fact, it doesn't make sense that Keyes would be saying, I went to this gas station and this gas station and this gas station after when he's confessing supposedly this big thing that had happened. So Carroll Hamilton, so there is actually, yeah, there's little evidence to prove that it was Keyes who killed Rose, even less to prove that he did so intentionally. There's lots of questions. And in People v. Simpson, the Illinois Supreme Court case where counsel was similarly found ineffective for allowing a third party to confession to come in, the court there said there's ample evidence in this case. They had someone who saw the shooting from a close distance, or not a shooting, it was a beating, identify the defendant. They had one of his accomplices who said, defendant was with me, but they still said confessions are so So here when you have these two big questions, was it Keyes? And if it was Keyes, did you do so intentionally? And you have counsel allowing the jury to hear. The police officers believe that this statement from Nick and their investigation is more than sufficient to prove that Keyes killed Rose. And then they also have, where there's all of this doubt about whether Keyes ever confessed, when there's all of these questions about timing and whether it really could have been Keyes, they have a confession that he supposedly made to his own This is extremely damaging evidence. And so in this case, it really could have made a difference, because I don't think the evidence was even close to overwhelming. Well, the police did. Hamilton led them to the house where the body was burned. Isn't that correct? He was released from prison or from jail at that point. And after he spoke with the police and actually took him to the house. Yeah, I would have three responses to that first, that again, only proves the acts after not the act before. Also, it's one of the theories that counsel gave a trial was that he had lived with Keyes for some time. So he could have just guessed on that. And the other thing that I would point out was that Ricky Mullins, who was one of I may not have the first name, right, but Mullins was the last name who was one of Keyes cousins was Carol Hamilton made his statement to the police. So there could have easily been information that he got that from somewhere else. So again, when you're that would that evidence alone be sufficient to convict? I would say no, it wouldn't when you're relying so much on Carol Hamilton. But when you get these extra, extremely prejudicial stuff, it can easily come into the jury's verdict and impact them. It's very easy to say we don't need to carefully consider all this evidence because the police believe he's guilty and because he confessed to his own cousin. Um, does this court have any other questions on the ineffectiveness? I would also say, in addition, even if this evidence did have relevance, counsel is ineffective for not providing a limiting instruction on that evidence that while there is no PI, no API, that covers this specific example, the API, this court has repeatedly said when hearsay is offered, it must be limited in that regard. And here was clearly hearsay. So it should have been limited. Oh, thank you. If we can move on to the compulsory jointer issue, which I believe is one of the other issues you wanted to discuss today. Your argument with regard to compulsory jointer is really based on the point you make that a preliminary hearing commences a prosecution. What authority do you have for that position? So there's no case law that seems to address this either way, but I have three constitutional or statutory provisions that I can cite. The constitutional provision, probably being the most important, says no person in Illinois, I'm going to try to get the stat to the quote here. Um, no, only allows a defendant to be held to answer for a crime punishable by imprisonment when the initial charge was brought against them. Indictment or when the person has been giving a prompt preliminary hearing to establish probable cause. There's no mention of information in there. It is the preliminary hearing that triggers commencement when a person is held to answer that, um, causes that to occur. Also similar to that, the commencement of prosecution statute, which is literally titled commencement of prosecutions indicates that no prosecution may be pursued until a was something I didn't realize in my reply brief. It's just something I've come up with today. So I'm happy that your honor asked me about this. Um, even the state, the statute that the state cites, which is this general prosecution statute, which I would note was created before the Illinois constitution in any event, but it also says, um, that the prosecution prosecutions began when there has been a return of the indictment or the issuance of the information. They did not say of an information in that statute. So I would say it can be harmonized with both of these other two statutes and black's law actually defines issuance as to be put forth officially noting as an example that without probable cause a search warrant will not issue. So again, that focuses on the probable cause. So we've got these three different provisions, including the Illinois constant. I'm sorry. Right. But a preliminary hearing, as you just indicated is necessary to determine the validity of the charge against the defendant, which means does it not that the charging instrument comes first? I mean, if for example, the judge finds no probable cause what happens? Yeah. The charge is dismissed. Yes. So, in other words, the finding no probable cause ends the prosecution. It doesn't begin the prosecution. I would say that it does. And the information is just the placeholder that prosecutor fills out to get this probable cause hearing. Suppose somebody is arrested. Is that when the prosecution starts? That's when adversarial proceedings begin, but not when the prosecution starts would be my argument. I'm sorry. That's an answer. I guess there are better. But no, I would say the prosecution has not started. And that's oh, I see what you're saying. But I think the speedy trial statute that sets the date of arrest because we're looking, it's meant to prevent a defendant from being in custody for too long. So there can be a different thing that starts. You're only in custody because you've been arrested on a charge. But you can also be arrested before an information is filed. So it can't be the same answer. So then I think we go back and look at if you want to look at the purposes when you file an information, unlike a grand jury indictment, you don't have to prove anything. The prosecutor just signs it. So it makes sense when you're looking at where what is the place where the prosecutor has to present their evidence. That should be when prosecution starts. In addition to all of the plain language of these statutes. But again, go ahead, Justice Leonard. Well, just just I guess what I'll say to focus on the facts as it relates to the particular time period we're talking about. Would you concede that as of October 31st of 2017, the state did not know the autopsy results, or Dr. Denton's opinion, the presence of the burn site that they had not yet the investigator had not yet processed the car and had not had Hamilton's information as of October 31st? Would you concede that? Yes, I would. And I believe the state concedes it was the day after November 1st that they got enough information. Yeah, the issue does depend on whether because I think they had the bond hearing like at 115. And they found the body in the car after that. So it definitely depends. This issue does hinge on when prosecution begins. Yes. And counsel, your your time is up. But Justice Connick, do you have any other questions at this point? I'm a Justice Leonard. No, I do not. You'll have time on rebuttal then. Thank you, Miss Foreman. Mr. Levin. Thank you, Your Honor. Again, for the record, I'm Assistant Attorney General Eric Levin, on behalf of the people of the state of Illinois. I'd like to start where my opposing counsel did with the ineffective assistance of counsel claim. And I think the easiest way for this court to resolve that claim is simply on prejudice grounds. The evidence of the defendant's guilt here was not simply sufficient, it was overwhelming. And that's even putting aside anything that was brought in through the police video interrogation video. We have evidence here that the defendant confessed to his friend, Carol Hamilton, who was in the jail cell next to him after he was arrested. He admitted to having killed Barbara, whether accidentally or not. I mean, apparently, according to Hamilton, he said it was they were joking around, but he does confess to having killed her. And that he provides a very detailed recounting of all of the steps that defendant took afterwards to then conceal that death and dispose of Barbara's remains. And much of that recounting is corroborated by independent physical evidence. We have the presumptive blood that was found both in the bedroom where the shooting presumably occurred, and then throughout the house and essentially in a trail leading to the garage. We have the surveillance videos from both gas station and the Walmart, which show that within an hour or two of this shooting, within an hour or two of the last time that Barbara was seen alive with defendant at around 3 or 3.30 a.m., within an hour or two of that at around 5.15 a.m., defendant is at a gas station filling up a can with gasoline. He's then buying plastic painters tarps and a comforter at Walmart. He later comes back to the Walmart that evening to buy a lighter and camping fuel. And then, of course, we have the evidence that later on Barbara's burned and dismembered remains were found in the back seat of defendant's mother's car in a garbage bag with defendant's fingerprint on it. And some of the remains, I believe the jaw was wrapped in a very distinctive piece of cloth that looked very similar to the T-shirt that defendant was wearing a few days earlier during his first police interview. So the idea that somehow defendant had nothing to do with Barbara's disappearance, somebody else must have killed her somewhere else, and then all of this other evidence just sort of came into being is, frankly, it's not a story that any accidental versus intentional. The evidence of the extreme lengths the defendant went to here to conceal this death is inconsistent with the idea that it was accidental. We have not only his actions afterwards, which I've sort of just gone over, but his demeanor afterwards. He's seen on that Walmart surveillance video calmly walking through the store, smiling on his way out. His other girlfriend, Rhonda Crippen, testified that he came over to her house that evening acting normally. I believe she testified they ate dinner and watched movies. And Crippen also testified that over the course of the next week, while defendant was taking all these other steps, he spent every night but one with her. So the totality of the evidence here, as I say, was not simply sufficient to support defendant's conviction for first degree murder, but the overwhelming. And when it's compared against the relative insignificance of what comes out in the police interview video, you know, there's no defendant... Well, counsel, when you say relative insignificance, opposing counsel strenuously argued otherwise, that this was, these statements were very prejudicial, and that the defendant invoked his right to silence. How is it that you call them insignificant when the police accused him several times of having killed her, gave him opportunities to say it was accidental. He certainly didn't respond to that. And then made the comments that we've heard in this argument before, or a little bit ago, that, you know, if this is what you think, then go ahead and arrest me. Why wasn't that invoking his right to silence? Well, Your Honor, to sort of answer that last question first, the defendant here made what is, you know, sort of the definition of an equivocal statement. He said, if you believe, if you think from your investigation that I did something, then ain't nothing furthermore for us to talk about. That's fundamentally different than the types of invocations we see in the other cases defendant relies on, where a person sort of I don't want to talk, or I don't have anything to say. Here we have an if you, so the context of this is the detectives are sort of telling the defendant, you know, we've talked to your cousin Nick, what we're getting from him, is this an accident? You know, if that's the case, let us know. And he says, no, I didn't do anything, period, point blank. And if you think I did something, if that's the case, then there's nothing further for us to talk about. So I think there's two important factors there. One, that if then formulation is equivocal. And two, read in context, the statement's ambiguous. It's not a direct, I don't have anything to say, or I don't want to say anything, which is in the case, you know, in Flores and Ward and Cox. This is a nothing furthermore for us to talk about. Read in context, the entire thing suggests that the defendant's this interview is pointless, there's there'd be no point to continuing, but it's not a direct invocation. And I think importantly, for our purposes here, this is not a standalone Miranda claim, where we're asking simply did the defendant unequivocally and unambiguously invoke his right to remain silence to silence, but because it's raised in the context of an ineffective assistance claim, we not only have the prejudice component, but we also have the question of was it objectively unreasonable for counsel to conclude that there would not have been merit to raising a Miranda claim under these circumstances. And at the very least, in light of all that I've just discussed, at the very least, counsel could have reasonably concluded that this was not the type of unequivocal and unambiguous invocation of the right to silence that would support suppression. With respect to the question of prejudice, as I understand it, the things that defendant is now challenging in that video was the detectives' statements about their view of the evidence and what it showed. But with respect to that, I would note that the jury ultimately learned a lot more about the case than the detectives themselves knew at the time they were interviewing defendant. At the time of that interview, Barbara's body had not been found. The detectives didn't know that the defendant had burned and then cut up Barbara's body. At that point, the detectives didn't know that he would eventually confess to Hamilton. These are all things that the jury ended up hearing later. And so the idea that the jury would have just simply deferred to the police officer's view of the evidence rather than making their own independent assessment of the evidence, I don't think that stands up to scrutiny. The other, with respect to sort of the implication that the detectives give that Nick Patton, defendant's cousin, had told them that defendant essentially admitted to killing Barbara but claimed it was an accident. I think first, counsel could have reasonably determined that that was admissible, relevant and admissible, because again, it went to rebutting defendant's alternative argument at trial. No doubt the main argument at trial was I simply didn't do anything. But counsel, you know, recognizing I suspect that that was probably not a defense that the jury was going to buy, counsel did make the alternative argument. I mean, she didn't really flesh it out in a lot of great detail, but she did preserve that alternative argument that even if the people had proved that defendant was responsible for the killing, that it was accidental. And so it was important to get in this fact that defendant, when confronted with these statements or alleged statements from Patton, vehemently and repeatedly denied that there had been any accidents. And beyond that, counsel here, and again, I think the strength of the evidence is relevant not only to the prejudice prong, and I think as courts often do, this court can simply resolve this case on prejudice grounds, but if the court does look to the performance prong, I think it's important to assess counsel's performance against the backdrop of the extremely difficult case she was faced with. She did not have a lot of great options here based on the evidence, and then based on defendant's repeated denials of any involvement in the disappearance, you know, despite the fact, again, that the body was found in his car with his fingerprint on the bag, etc. There was, counsel didn't have a lot of options here, and so it would not have been unreasonable for counsel to conclude that on balance, it would be more beneficial than it would be harmful to allow this video in and let the jury hear defendant's side of the story. This allowed the defendant to give the jury his version of events, to explain away certain pieces of seemingly incriminating evidence, like the missing piece of carpet in the bedroom, and it allowed the defendant to do all of this without being subject to cross-examination, without having to take the stand, and so again, we can't assess counsel's performance now through the lens of hindsight. I mean, of course, now we know that the strategy wasn't successful, but it's likely the case that no strategy would have been successful on these facts, and counsel made a reasoned professional judgment about the best way to only if counsel's decisions were objectively unreasonable, and I don't think defendant can meet that standard here, but again, as is often the case, I think the court can sort of avoid assessing counsel's performance just by looking at the prejudice prong here and recognizing that in light of the overwhelming evidence and looking at what actually came in on that video, there's simply no reasonable probability that the result of the trial would have been different if counsel had made these objections. If there are no further questions on the ineffective assistance claim, I would like to briefly touch on the compulsory joinder issue that my opposing counsel talked about, and I think it's helpful now to recognize that this issue does come down simply to the fact of this prosecution commenced. If I understood my opposing counsel's argument correctly, the defendant concedes that if the prosecution commenced on October 31st with the filing of the information, then the compulsory joinder issue fails, and the fact of the matter is that the Code of Criminal Procedure, section 2-16, which we cite in our brief, defines a prosecution as, and I'm paraphrasing a little bit here, but all proceedings to determine a person's legal liability, and this is a quote, commencing with, end quote, the issuance of the information or the return of an indictment. And this is the statute that the other cases we cite in our brief, people versus Levitt, people versus Mann, people versus Makin, people versus Herndon, so there's ample case law on this subject which recognize that the return of an indictment or the issuance or filing of an information commences a prosecution. Now, there's no doubt that a felony prosecution that's commenced by information won't proceed very far if there's not a timely preliminary hearing held or a waiver of that preliminary hearing, but the fact that that prosecution can't be further pursued doesn't mean it was never commenced in the first place. And, you know, I think it's important to recognize that the defendant's argument here would have implications not only for the compulsory joinder law, but also for statute of limitations purposes, and the question under the statute of limitations is often, did the people commence the prosecution within the statute of limitations? And so a lot of the cases we cite are actually statute of limitations by commencing a prosecution either by getting an indictment or by filing an information. Under the defendant's reading, it would sort of throw a lot of that into doubt. The people wouldn't actually know if they would be able to timely bring a prosecution by information if ultimately what it all boiled down to was when was the preliminary hearing held. And so we need clear rules are important here, not only in the compulsory joinder context, but in the statute of limitations context. And the code of criminal procedure does provide a clear bright line rule, which is that a felony prosecution commences either with the return of an indictment or the filing or issuance of an information. And just to briefly touch on this sort of supposed distinction between issuing an information and filing an information, I think that's essentially a distinction without a difference. I mean, an information becomes issued when it's filed. The preliminary hearing is simply a step to determine whether the prosecution can then further proceed. And if the court doesn't find probable cause or if a preliminary hearing is not held in a timely manner, the case is just dismissed without prejudice. The people can then rebring those charges either through indictment or through a new information. So again, I think this all points to the fact that it's that the filing of the information that commences the prosecution. And if that's the case, I think we all now agree that there would have been no merit to any motion to dismiss on speedy trial grounds based on a compulsory joinder violation. Counsel, I do have one question as it relates to the charge for concealment of a homicidal death that was filed in 2017. That is a, the language in that charge was rather general, if you will. And there were more specific charges than filed in 2019. Do you think that broad, or how do you address the issue that that broad description would then include any other actions of hiding or moving the body, if you will? Well, I don't think that's the language in there. There was not a reason for us to allege the hiding or disposing. It was enough to allege that the defendant transported the body from the place of death. But I think it's important if we sort of look at this in context, when that information was filed, the people had not discovered the body yet. They had no reason to think that this body had been burned, had been cut up, had been moved to these other locations. And so the people couldn't have charged that offense, even if they had wanted to. But the transporting would suggest at least an indication it had been moved because it had not been located. Correct. I think, and that's why at that point we did have sufficient evidence to bring that one concealment charge, because we did know at that point, we suspected and we had evidence to prove that the defendant had killed Barbara. And then we also had evidence that in the bedroom, and then we also had evidence that the body was not there. So we did have reasonable evidence to bring a charge for transporting the body from the place of death and hiding or getting rid of it, essentially. And that's what we knew at that time. But we did not know any specifics that would support the additional charges we later brought, which were that he then moved the body to the field at 1519 South Lyons Street, that he then burned the body at that location, that he then returned to that scene at least a Focusing though on the move itself, why would not the move to the 1519 address be included in the 2017 charge? If it's the act of transporting, setting aside, what I will say, the burning of the body or the cutting of the body? Well, Your Honor, I would say that to the extent that the court thinks that any of the 2019 charges were sort of the same act based on the same act as a 2017 charge, then I would say that it would only extend to that one 2019 concealment charge about moving the body to the field. Everything else, I think, would still stand. So even if that charge had been subject to a speedy trial motion on compulsory joint or grounds, it would not undermine the two dismemberment counts, which are undoubtedly based on different acts, or that final concealment charge of moving the remains into the mother's car, that as well. So I think we would still have those additional charges. And I think the similar argument would also apply to the multiple convictions count, which I don't know if I have a lot of time to address that. But we do talk about that in our brief. And here, what I think the key point to recognize is that this is not a case. We're not arguing that, for instance, the defendant cut off both of Barbara's hands and both of her feet, removed the jaw. We agree that that only subjected him to one dismemberment count because all of those acts were taken in a single course of conduct. It's the fact that that act and the act of burning were separated by at least one to two days. Critically, there's an intervening event between them, that first interview with the police where he develops a fresh intent, a new impetus to conceal the body and to dismember. And so the fact that those are based on separate courses of conduct means that the multiple convictions are proper. So they're separate physical acts is what you're saying that took place. Is that right? Well, I would go one step further. They're separate physical acts that each themselves made up discrete courses of conduct. So all of the cutting off of the limbs were themselves separate acts, but they were all in one course of conduct. The burning is a separate course of conduct. Right. But then going back to Justice Leonard's question regarding moving the body, that actually took place on a different date, did it not? Then that is moving the body to the house on a different date than moving it out of the her house to the garage. Yes. And I think you know that that was a different date than was alleged in the 2017 charge. Yes. And I see my time is up, but I do want to make clear. I'm not conceding that even that concealment count about moving to the field doesn't. I think that's probably the toughest one for us. But even there, as you point out, Your Honor, we allege that those acts took place on different dates. The moving to the garage was on or about October 22nd. The moving to the field was on or about the 23rd to the 26th, I believe. And we know that those didn't happen on the same date because the day on October 23rd, the defendant asks a different cousin, Lenny Strader, I believe, if he can borrow his truck to move some weights, suggesting that he hadn't moved the body yet. And so even there, we allege the different dates, different actions. So I think all of the counts survive under this compulsory joined argument and the multiple convictions argument. But I just want to make clear that even if you think one of those concealment counts can't stand, the remaining counts are still good. Justice Leonard, any follow-up questions? No, thank you. Justice Connacht, any questions? None from me. All right. And I don't have any further questions. Thank you very much, counsel. Thank you, Your Honor. Ms. Borland? Yes, thank you, Your Honor. I do have a few points to touch on regarding the ineffective assistance argument, but I want to have time to address the allowable unit of prosecution statute too. So regarding prejudice, I would just say it doesn't have to be that someone killed her somewhere else. It just did the state prove that he's killed her at all. And the fact that she may have been killed in the house, he could have feared that he would held responsible for that, say she committed suicide or any number of other reasons. And to that degree, the fact that he was not acting like he killed someone in some of these surveillance videos could easily be interpreted by the jury as one more fact to suggest this doesn't look like someone who just killed someone, let alone intentionally. Regarding counsel, he sat there with her. He indicated in a minute he sat there with her for 30 minutes while her heart beat and she was bleeding and did nothing. Well, if that's from Carol Hamilton's testimony and in that same testimony, Carol Hamilton said he thought he should like to call 911, but didn't do it. And I would also say that conflicts with the medical examiner's testimony that she would have died within two to five minutes. So to me, that's just one more thing that makes Carol Hamilton less credible, but also he did show remorse. He's crying in the jail. Alfreda Lester, his mom says that something's eating at him to the point that she has to cry to do that. There's lots of different factors that the jury needs to look at this. And he did say at that point, she'd been shot in the face. So he would likely know there was little he could do, but he did at least, even if you take Carol Hamilton at his word, he did at least think about calling the police. But at this point, you can obviously tell given the extensive efforts he takes to cover up this death, that he's trying to figure out what do I do here right now? So all of these competing thoughts are going through his head. But at the very least, if you believe Carol Hamilton, he did at least think about calling the police. In terms of counsel wanting the jury to hear Nick's statement, counsel vigorously challenged the evidence of this trial. She was far from believing this was an overwhelming case. And indeed, when she specifically tackled Nick's testimony or these references to Nick, she distanced him. I won't read the whole quote, it's on the record 1225, but she's like, little mention of Nick Patton, who even is he? Why haven't they called him as a witness? If the cops are saying this, hey, we talked to Nick Patton, why haven't we called him? She even says, was that just an interrogation technique? So she's clearly trying to distance himself. She never makes any reference to say Nick also says it's an accident. And by even getting this redacted, she doesn't have to address it. But at the very least, getting an instruction saying that this might just be an interrogation technique because you're only to look at the effect of these statements on keys would have supported that testimony. On our compulsory issue, the state relies on this case law. They say that it all says it's when an indictment is filed or an information is I'm sorry, when an information is filed or when an indictment is found. It's actually confusing at least one of the cases cited by the state says the opposite and says it's when an indictment is filed and when an information is found. So there's not going to be this court interrupting any well established authority on this issue. And I would say this I find it interesting that the state still has not addressed the statute entitled commencement of prosecutions. And it's instead relying on this general statute that defines prosecution for all of the code, which again, I think is consistent with the other two, particularly since that general definition was created before the Illinois constitution was admitted to even allow an indictment by a prosecution by an information. And I also think this argument about the state having clear guidance on when a prosecution begins, that's not really an issue here because the state had more than one year after the state now concedes it had knowledge to charge keys because there was an additional charge that they tried them on unrelated to this. So there's no timing like, oh, it's a matter of days. We got to get this straight. The state had more than a year to bring these charges. The whole purpose of the compulsory Joinder statute is to prevent litigation and unfair prosecution, but it took the state more than two years to bring those charges certainly goes against the purpose of that. And I would even say providing a definitive date and looking at the preliminary hearing as that date helps the state because all of these arguments about at the time the prosecutor filed the information, they didn't know this, they hadn't found the body. This gives them all of the time, just like they would have with a grand jury to gather their information and bring it by the time of the preliminary hearing. So it's very similar and puts these two things on equal footing and allows the state more opportunity to make sure it's got the proper charges by that date. And on our last issue regarding the allowable unit of prosecution, there is no way around it. You cannot have a defendant convicted for multiple Thank you. Justice connect. Do you have any further questions? No. Justice Leonard? No, thank you. All right. Thank you. All right. Thank you, counsel for your arguments this afternoon. The court will take the matter under advisement and render a decision in due course. At this time, court is adjourned for the day.